UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-03-314-1 |
| | § | CIVIL ACTION  NO. H-08-481 |
| SAM JIMMIE MANN, | § | |
| | § | |
| Defendant-Movant. | § | |

**MEMORANDUM AND RECOMMENDATION GRANTING
GOVERNMENT'S MOTION FOR DISMISSAL AND DENYING
§ 2255 MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE**

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is the Government's Response to and Motion for Dismissal (Document Nos. 213 & 214), and Movant Sam Jimmie Mann's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 204).  Having considered Mann's Motion to Vacate, Set Aside or Correct Sentence, the Government's Response to and Motion for Dismissal, Mann's Response to the Government's Motion for Dismissal (Document No. 215), the record of the proceedings before the District Court in the underlying criminal case and on appeal, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion for Dismissal be GRANTED, that Mann's § 2255 Motion to Vacate, Set Aside or Correct Sentence be DENIED, and that this § 2255 proceeding be DISMISSED.

## I.   Procedural History

Movant Sam Jimmie Mann ("Mann"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255. This is Mann's first motion pursuant to § 2255.

On August 13, 2003, Mann was charged, along with one co-Defendant, in a fifty-two count Indictment, with conspiracy to violate federal law, in violation of 18 U.S.C. § 371 (Count 1); interference with commerce by threat or violence (otherwise known as "Hobbs Act extortion"), in violation of 18 U.S.C. §§ 1951, 2 (Counts 2-9), and wire fraud, in violation of 18 U.S.C. §§ 1343, 2 (Counts 10-52). Mann pled not guilty and proceeded to trial. His co-defendant, Gerald Davis, pled guilty to count one, and testified against Mann at trial. On February 9, 2005, following a six day trial, a jury found Mann guilty on all counts. (Document No. 124). The Court, however, acquitted Mann on Counts 5 and 6. (Document No. 120). Thereafter, on June 16, 2005, following the preparation of a presentence investigation report ("PSR"), to which Mann filed Objections (Document No. 142), the District Court sentenced Mann to sixty-three (63) months confinement, to be followed by a three year term of supervised release, and restitution in the amount of $390,931.57. (Document No. 162). A Judgment of Conviction was entered on June 23, 2005. (Document No. 166).

Mann appealed his conviction to the Fifth Circuit Court of Appeals. The Fifth Circuit, in published opinion entered on July 19, 2007, reversed Mann's convictions on counts 2, 4, 7, 8 and 9 (Hobbs Act extortion counts), and affirmed his convictions on all the other counts. *United States v. Mann*, 493 F.3d 484 (5th Cir. 2007). Thereafter, on October 3, 2007, the District Court entered an Amended Judgment, which reflected the Fifth Circuit's reversal on counts 2, 4, 7, 8, and, which

imposed the same 63-month sentence on Mann. (Document No. 199). On February 8, 2008, Mann filed a § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 204). The Government has filed a Response to that motion, and a Motion for Dismissal (Document Nos. 213 & 214), to which Mann has filed a response in opposition (Document No. 215). This § 2255 proceeding is ripe for ruling.

**II.     Factual Background**

The factual background, set forth by the Fifth Circuit Court of Appeals in its July 19, 2007, decision, is as follows:

> Mann served as police commissioner for the city of Kendleton, Texas, from 1996 until 2000. In 2003, a grand jury indicted Mann on 52 counts stemming from his alleged misdeeds during his time as police commissioner. A jury found Mann guilty of all 52 counts, but the trial judge granted Mann's motion for acquittal as to counts 5 and 6. The judge then sentenced Mann to serve 60 months of imprisonment on count 1 and counts 10 through 52, and 63 months of imprisonment on counts 2, 3, 4, 7, 8, and 9, all such terms to run concurrently. The district court also ordered, *inter alia,* that Mann pay $390,931.57 in restitution. On appeal, Mann challenges the sufficiency of the evidence underlying all of his convictions. He also asserts that the district court made numerous errors in calculating his offense level under the United States Sentencing Guidelines and that the amount of restitution it ordered was an abuse of its discretion.
>
> The following facts were adduced at Mann's trial. Kendleton is a small town of about 600 people in Fort Bend County, Texas. United States Highway 59 passes through the center of the town on its northbound route to Houston. In 1996, the mayor of Kendleton, Carolyn Jones, hired Mann to serve as police commissioner. Prior to Mann's arrival, Kendleton did not have a police commissioner, and the Kendleton Police Department ("KPD") was headed by Clarence Hodges, who had been named police chief in 1996. Mann served as police commissioner, a position superior to police chief, until his termination in March of 2000.

*A. The warrant scheme*

Like many municipalities, Kendleton derived substantial revenue from issuing traffic tickets. In Texas, however, municipalities of under 5,000 inhabitants are limited, with some exceptions, to deriving only thirty percent of their revenue from fines collected from violations of state highway law. TEX. TRANSP. CODE ANN. § 542.402(b). Any additional fines must be sent, less one dollar, to the state of Texas. *Id.* Over time, Kendleton became indebted to the state due to its failure to follow this provision. By May of 2000, Kendleton owed the state approximately $500,000 in unremitted excess fines and associated court costs.

In April of 2000, members of the Kendleton City Council became concerned about this shortfall and sent a letter to Texas Ranger Jeff Cook, requesting that he investigate the KPD. In the letter, the councilmembers explained their concern that ticket revenue was being collected and not forwarded to the state, causing the city to fall deeper into debt. Specifically, the letter suggested that the KPD was collecting cash in satisfaction of fines. Cook investigated these allegations by interviewing former and present Kendleton officers and reviewing the department's bank records; he concluded from this investigation that "there were some general standard practices being used in Kendleton that [he] had never seen before." Cook explained that in other municipalities, if a person did not pay his or her traffic fine, the court would issue a warrant and send it to the police department to serve, but the money collected following the issuance of the warrant would go directly to the municipal court. By contrast, the KPD would issue the warrant itself, stamp it with a judge's signature, and then attempt to collect it. Once an officer collected the money, it would be deposited into the department's bank account. Cook stated that this procedure was unique to Kendleton.

On May 8, 2000, Cook executed a search warrant for the city's offices and the KPD, which occupied a single building in Kendleton. The search recovered the KPD's "warrant transaction sheets," which were used to record fines paid to the department in satisfaction of warrants. Cook compared the names on the sheets with the names of individuals whose checks and money orders were deposited into the department's bank account, and discovered a "big anomaly" between the lists of names. Cook concluded that the department was accepting payment in cash, checks, or money orders, but only depositing the checks and money orders to the account. The warrant transaction sheets only reflected the amounts paid in cash to the department. Cook also noted numerous money orders in very small amounts, as little as one dollar, deposited into the department's account. He concluded that in order to make the cash total on the transaction sheet equal to the amount deposited into the bank account, the department would purchase these small money orders to make it look as if the amounts paid to the department were all being deposited.

Cook noted a second anomaly with the KPD's bank account, which was that it was used to pay the salaries of the officers, as well as the department's operating costs. He stated this was unusual because most municipalities have a single budget that covers all departments, so the police department would not be as directly self-financed as Kendleton's. Once Cook identified this "theft scheme," he alerted an FBI agent to his conclusions.

The warrant division of the KPD was run by Gerald Davis, who was in charge of all the warrants issued by the department, as well as all money received to pay the warrants. Davis would collect the fines and also make the concurrent bank deposits. During Cook's investigation, he spoke with Davis about the operations of the warrants division, and Davis indicated that the department only accepted cash payments under extraordinary circumstances, and the department had a policy, instituted by Mann, that forbade the acceptance of cash. Davis's testimony, recounted below, revealed this statement to be false. Davis was the critical witness against Mann at trial where he testified that he was "very close" with Mann and that Mann was like a "father figure" to him. Davis explained that the scheme began one day when a check from a Western Union wire transfer arrived at the KPD in Davis's name. Davis alerted Mann, who instructed Davis to cash the check. Davis did so, and Mann told Davis to give him the money. Davis did this as well. Mann told Davis that he intended to keep the money and instructed Davis to "do the switchout." Davis had to ask what that meant, and Mann explained that he was to switch the name of someone who paid cash with the name of the sender of the Western Union order. Mann told Davis that the cash was going to be for a "separate account," and so Davis gave Mann deposit slips and warrant jackets to accompany the payments. Eventually, Mann instructed Davis to destroy the warrant jackets that accompanied some of the payments "to keep anyone from figuring out what happened." Thereafter, Davis destroyed the jackets by burning them in the barbeque pit at his house and ceased providing the supporting paperwork to Mann.

Davis explained that he then began holding checks and money orders until he collected an equivalent amount of cash, then depositing the checks and money orders but noting only the cash payments on the warrant transaction sheets. Davis would also purchase the low-value money orders necessary to make up any discrepancy between the amount recorded on the warrant transaction sheets and the amount deposited. Davis testified that Mann had instructed him to do all of these things and had initially given Davis the cash to purchase the money orders.

Davis reviewed a number of warrant transaction sheets he prepared and explained this process to the jury in great detail. He also stated that he "had to try to mislead" city councilmembers, the department's bookkeepers, or anyone with questions about the KPD's finances. To this end, he maintained two sets of receipt books, one of which was a "dummy book" from which he would give receipts to those who paid by check

or money order; Davis would destroy this book once all of its receipts had been issued. Mann would retain the "legitimate" receipt books in his office once Davis filled them.

Davis instructed several different officers of the KPD warrants division to go to the homes of people who had received warrants and collect cash from them. These officers would give him the cash at his home, their homes, the police department, or Club Uptown, which was owned by Mann. Mann would periodically ask Davis how much cash he had collected, and Davis would then turn the money over to Mann, who would give Davis some portion of it to keep for himself. Davis testified that this activity continued even after Mann had left the police department following his termination as police commissioner-Davis would meet Mann at his home or club and the two would divide the cash. Davis testified that on a few occasions, he kept all of the cash for himself. On one occasion, Davis directly paid the collecting officer, A.J. Frank, with the cash he had collected per an instruction from Mann. According to Davis, Mann observed him collecting cash "several times." Davis also testified that Mann typed checks drawing on the KPD account two or three times per week.

*B. The COPS scheme*

During Mann's tenure as police commissioner, Kendleton applied for a grant from the federally-funded Community Oriented Policing Services ("COPS") universal hiring program. The application was signed by Mann, as Kendleton's top law enforcement executive, and Jones, as Kendleton's top government executive. Mann and Jones also signed a certification indicating that the information provided on the application was true. The application form made it clear that COPS grant money could only be used for "new officer positions." The application requested funding for six additional full-time police officers in 1997, three more in 1998, three more in 1999, and one more in 2000. The application also stated that the current entry level salary for a Kendleton police officer was $18,500 per year, plus $4,440 in benefits. The grant application was accepted, and the COPS program awarded Kendleton a grant of $318,171 to be used over time to partially fund the salaries of six additional full-time entry-level officers. Mann and Jones signed the document accepting the award on May 1, 1998. The acceptance document repeated the proviso that the funds "must be used to hire one or more new, additional career law enforcement officers .... Unless authorized in writing by the COPS office, grant funds may not be applied to the salary or benefits of an officer hired by a grantee prior to the award start date."

Ronald Waddell, a retired former employee of the Department of Justice's Office of the Inspector General ("OIG"), testified that as part of his job he monitored audits of the recipients of COPS grants. At some point, Waddell oversaw an audit of Kendleton's COPS grant that turned up substantial irregularities, causing him to turn the matter over to the investigations division of the OIG. Waddell explained that

6

COPS universal hiring program money may only be used to hire additional entry-level officers, not to fund the salaries or benefits of officers already on the grantee's payroll. He testified that at the time the application was filed, Kendleton did not pay any health benefits to its officers, contrary to what was stated on the grant application. Moreover, Kendleton paid its entry-level officers just $10,000 per year, much less than the application stated. Waddell explained that the award start date was May 1, 1998, and so all officers receiving COPS money had to be hired after that date. Shortly after the award start date, the City of Kendleton began drawing $4,684 dollars out of the available COPS money every couple of weeks until the payments were stopped in May of 2000. The money, a total of $213,297, was wired from a federal reserve bank in New Jersey to Kendleton's bank in Texas.

Waddell described the first annual report to COPS submitted by Kendleton, also signed by Mann. The report was intended to describe how Kendleton spent the COPS grant money allocated during 1998. The report contained numerous misrepresentations. For example, it stated that the officer with Badge No. 801, for whom COPS money was allocated, was newly hired on June 11, 1998. Badge No. 801 was Mann's badge. Similar information was filled in for Officers Bruce Jackson, Darryl Smith, Gerald Davis, Rene Becerra, and Michael Davis. Waddell testified that he had analyzed payroll information for Kendleton and found that all of these officers were on the payroll prior to the issuance of the COPS grant.

*Mann*, 493 F.3d at 488-491.

### III. Claims

Mann raises alleges in this § 2255 proceeding: that he was denied his Sixth Amendment right to the effective assistance of counsel at trial. According to Mann, his trial counsel was ineffective during the Grand Jury proceedings for failing to challenge the testimony of the Government witnesses, was ineffective in the preparation for trial, was ineffective at trial for failing to challenge the testimony of the Government's witnesses, was ineffective at trial for failing to file the same type of motions that were filed by counsel for his co-defendant, and was ineffective for failing to fully consult with him.

**III.     Discussion**

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel at all critical stages of the proceedings. *Teague v. Scott*, 60 F.3d 1167, 1170 (5th Cir. 1995). To establish a violation of the Sixth Amendment's guarantee of effective assistance of counsel, a petitioner must show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id.* at 688-9. Under *Strickland*, a petitioner must establish both the deficiency and the prejudice prongs in order to be entitled to habeas relief. *Id.* at 687.

To establish deficient performance under *Strickland*, a petitioner must show that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. *Id.* at 687; *Teague*, 60 F.3d at 1170. Under *Strickland's* prejudice prong, a petitioner must be able to establish that absent his counsel's deficient performance the result of his trial would have been different or his sentence less severe. *Glover v. United States*, 531 U.S. 198, 203-205 (2001) (holding that any adverse effect on a defendant's sentence can constitute prejudice under *Strickland*); *Teague*, 60 F.2d at 1171; *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

Mann is not entitled to any relief on his ineffective assistance of counsel claim because he has makes no showing that counsel's performance was deficient or that he was prejudiced thereby. All

8

that Mann alleges in numerous bullet-points in his § 2255 motion are rambling complaints about what he believes his counsel should or should not have done. For example, Mann goes on at length about how he believes his counsel should have challenged the testimony of witnesses before the Grand Jury. In addition, Mann maintains that his counsel should have filed the exact same motions as filed by his co-defendant's counsel, should have obtained a ruling on the motion to sever that he did file, should have objected to his co-defendant's plea agreement, should have objected to the admission of any of the Government's documentary evidence, and should have consulted with him more about the case and the witnesses the Government intended to call. Each of these complaints are stated in the most conclusory terms without any supporting facts and without any legal argument as to how the result of the trial would have been different. Upon this record, where the evidence was meticulously analyzed by the Fifth Circuit Court of Appeals, and where the most critical evidence came from Mann's co-defendant, Gerald Davis, it cannot be said that counsel's performance in any way affected the outcome of the trial.[1] Thus, none of Mann's broad, unsupported, and conclusory allegations will

---

[1] The Fifth Circuit characterized as follows the substantial evidence supporting Mann's conviction for conspiracy:

> As described above, the government presented ample evidence at trial that Davis and Mann conspired to defraud Kendleton of money due to it from individuals who failed to appear in court. Davis testified that Mann instructed him to keep two sets of books in order to hide some of the money and to burn the warrant jackets associated with certain payments. Further, Davis testified that many of the checks and money orders arrived by mail, and Davis would mail receipts back to the individuals, which was part of the ordinary way in which warrants were processed. It was thus reasonably foreseeable to Mann that the emails would be used for the purpose of executing the scheme at the time it was concocted. We thus find that sufficient evidence supports Mann's conviction for conspiracy to violate federal law.

*Mann*, 493 F.3d at 493. As for the wire fraud convictions, the Fifth Circuit similarly found

9

support any relief in this proceeding. *See Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) (conclusory allegations of ineffective assistance of counsel are insufficient to warrant relief); *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding. . . . 'In the absence of a specific showing of how these alleged errors and omissions were constitutionally deficient, and how they prejudiced his right to a fair trial, we [can find] no merit to these [claims].'").

### IV.  Conclusion and Recommendation

Based on the foregoing and the conclusion that no relief is available to Mann on his ineffective assistance of counsel claim, the Magistrate Judge

---

sufficient evidence to support Mann's convictions on counts 10-52:

> Though Mann's defense was that he simply did not understand the rules of the COPS program, and thus he had no intent to defraud, the application he submitted indicated that Kendleton intended to hire new officers with the COPS money. Because he never hired any new officers and instead used the money to increase salaries and benefits of officers already on the payroll, the jury could infer that he had an intent to defraud when he submitted the application. Use of the wires in furtherance of the scheme was demonstrated by the transfers themselves. This use was reasonably foreseeable to Mann, though he had no role in establishing the bank account, because money is commonly paid over long distances by means of wire transfer.

*Id.*

RECOMMENDS that the Government's Motion for Dismissal (Document No. 214) be GRANTED, that Movant Sam Jimmie Mann's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 204) be DENIED, and that this § 2255 proceeding be DISMISSED on the merits.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 10th day of October, 2008.

Frances H. Stacy
United States Magistrate Judge